UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X
                                                                    :
JONATHAN ROSS, et al.,                                              :
                                                                    :
                                   Plaintiffs,                      :
                                                                    :
                   -v-                                              :
                                                                    :
AXA EQUITABLE LIFE INSURANCE COMPANY,                               :
                                                                    :
                                   Defendant.                       :
                                                                    :
--------------------------------------------------------------------X

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #:_____ |
| DATE FILED: 07/21/2015 |

14-CV-2904 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

Plaintiffs Jonathan Ross and David Levin bring this putative class action on behalf of

those who purchased life insurance from AXA Equitable Life Insurance Company ("AXA"),

alleging that AXA violated New York Insurance Law Section 4226 by engaging in various

"shadow insurance" transactions in connection with its life insurance business. Before the Court

are two motions: Plaintiffs' motion for class certification pursuant to Rule 23 of the Federal

Rules of Civil Procedure (Docket No. 87), and AXA's motion to dismiss Plaintiffs' Second

Amended Complaint (the "Complaint") (Docket No. 105). For the reasons that follow, the Court

concludes that Ross and Levin fail to show that they suffered a concrete injury-in-fact, as

required to establish standing under Article III of the U.S. Constitution. Accordingly, the Court

holds that it lacks subject-matter jurisdiction and that the Complaint must be dismissed.

Plaintiffs' motion for class certification is therefore denied as moot.

## BACKGROUND

Although the Court is not technically limited to the four corners of the Complaint in

assessing whether Plaintiffs have standing, *see Tandon v. Captain's Cove Marina of Bridgeport,*

*Inc.*, 752 F.3d 239, 243 (2d Cir. 2014), the following facts are taken from the Complaint and documents it incorporates by reference and are assumed to be true for the purposes of AXA's motion to dismiss, *see Karmely v. Wertheimer*, 737 F.3d 197, 199 (2d Cir. 2013); *WC Capital Mgmt., LLC v. UBS Sec., LLC*, 711 F.3d 322, 329 (2d Cir. 2013).

**A.  Life Insurance and Its Regulation in New York State**

Many consumers in the United States purchase life insurance to provide surviving loved ones with financial benefits after death, benefits that may help defray the cost of estate taxes and funeral expenses or counteract the loss of the decedent's income.  (Second Am. Compl. (Docket No. 105) ("SAC") ¶ 33).  Nevertheless, although many life insurance policies are contractually guaranteed for up to fifty years in the future, they are not guaranteed (as bank accounts are) by any federal agency such as the Federal Deposit Insurance Corporation.  (*Id.* ¶ 39).  Despite (or perhaps because of) the absence of such federal guarantees, life insurance companies are generally heavily regulated by state government agencies, including the New York State Department of Financial Services ("NYDFS"), which is charged with overseeing the practices of New York-based life insurance companies.  (*Id.* ¶ 40).

Given the nature of insurance, the number of claims a life insurer needs to satisfy at any given time — and, relatedly, the assets the company needs to satisfy them — is contingent on several factors, including mortality rates.  (*Id.* ¶ 43).  Accordingly, state regulations usually require life insurers to establish reserve liabilities ("reserves"), using formulas that account for such factors.  (*Id.* ¶¶ 42-43).  To support these reserves, life insurers must hold "admitted assets" — typically high-quality assets that a life insurer can reliably liquidate to pay outstanding claims. (*Id.* ¶ 42).  Nevertheless, while reserve requirements are calculated to cover more than a life insurer's likely projected risk, they are not sufficient to cover the total amount of an insurer's

exposure — meaning that in the event of a major "mortality event" (such as a terrorist attack or a pandemic) that greatly increases the number of claims at a given time, or a market disruption that reduces the assets held by insurance companies, a life insurer could find itself faced with more claims than its reserves are able to cover.  (*Id.* ¶¶ 43-44).

Perhaps because of these concerns, the National Association of Insurance Commissioners introduced two model regulations, known as Regulations XXX and AXXX, versions of which have since been adopted in New York.  (*Id.* ¶¶ 45-46).  Regulations XXX and AXXX apply to term and universal life insurance policies, respectively, and thus cover "the most significant life insurance products."  (*Id.* ¶¶ 45-46).  Among other things, they increase the burden of (or "conservatism of") statutory reserve requirements by, for example, increasing overall reserve level requirements and limiting a company's ability to use admitted assets for anything other than supporting its reserves.  (*Id.* ¶¶ 45-47).  The regulations also affect various measures associated with life insurance companies' risk-based capital, the minimum amount of capital insurers are required in order to protect policyholders.  (*Id.* ¶ 48).  In analyzing the financial health of a life insurance company, regulators and analysts often look to that company's risk-based capital ratio — the ratio of the insurer's total adjusted capital to the minimum amount of capital a company is required to hold under the relevant regulator's formula.  (*Id.* ¶ 50).  Because Regulations XXX and AXXX affect reserve requirements, and accordingly the minimum amount of capital required under New York regulations, both regulations have increased the amount of total adjusted capital a company must hold in order to obtain the same risk-based capital ratio they had prior to the regulations' promulgation.  (*Id.* ¶ 52).

**B.  Reinsurance Transactions**

To help minimize the risks involved in offering insurance, many insurers obtain reinsurance, whereby a primary insurer (or "ceding insurer") pays a premium to another insurer (the "reinsurer") in exchange for carrying some or all of the risk the primary insurer took on in writing an initial insurance policy.  (*Id.* ¶ 54.  In turn, primary insurers may claim "reserve credits" through such arrangements — in essence, reducing the assets a primary insurer is required to maintain in support of its reserve liabilities.  (*Id.* ¶¶ 55-57; *see* Mem. Law Supp. Def.'s Mot. To Dismiss Second Am. Compl. (Docket No. 106) ("Def.'s Mem.") 5; *see also* Decl. Bruce Birenboim Supp. Def.'s Mot. To Dismiss (Docket No. 107) ("Birenboim Decl."), Ex. 1 ("NYDFS Report") 1).  Effectively, therefore, reinsurance fulfills two functions: It can help manage risk and can free up capital for other purposes.  (SAC ¶ 55).

Nevertheless, because a primary insurer remains liable on all policyholder claims in the event that the reinsurer defaults, regulators generally allow primary insurers to take reserve credit only when there is sufficient assurance of the reinsurer's ability to pay claims for which it assumed risk.  (*Id.* ¶¶ 54, 56).  There are two categories of reinsurance transactions generally deemed "safe" enough to warrant granting the primary insurer a reserve credit: (1) those with reinsurers who are licensed or accredited by the primary insurer's own regulators ("authorized reinsurers"); and (2) those with unauthorized reinsurers who post sufficient high-quality, easily liquidated collateral to account for potential obligations — typically by maintaining a trust with a United States financial institution or by obtaining an irrevocable and renewable ("evergreen") letter of credit from a United States financial institution.  (*Id.* ¶¶ 56-58).  Occasionally, a primary insurer will seek reinsurance, not from an unaffiliated third-party insurer but, instead, from affiliated ("captive") entities — that is, a company owned by the insurer's parent company.  (*Id.*

¶ 59; NYDFS Report 1).  A primary insurer may claim reserve credit for these reinsurance transactions just as they can for those with unaffiliated third parties, so long as the captive reinsurer meets the above-mentioned requirements — that is, the captive insurer is either regulated by the primary insurer's own regulators or posts collateral deemed sufficient under the regulations prescribed by the primary insurer's domicile.  (SAC ¶ 59).

## C.  "Shadow Insurance" Transactions

In spite of these requirements for claiming reserve credits for reinsurance transactions, the NYDFS issued a report (the "Report") in 2012 finding that New York insurers had been using captive reinsurance as a way of conducting an "end-run around higher reserve requirements" and "hid[ing] risk."  (NYDFS Report 4).  A life insurer would typically accomplish that goal, the Report alleged, by creating a captive insurance entity based in another state or foreign jurisdiction with less stringent regulatory requirements.  (*Id.* at 1). When the primary insurer seeks reserve credits through a transaction with an unauthorized reinsurer, as noted above, that reinsurer must post sufficient collateral that meets the regulatory requirements of the primary insurer's domicile.  (SAC ¶¶ 59, 65).  Nevertheless, the NYDFS Report alleges that many life insurers and their captive reinsurers flouted this requirement by exploiting the looser reserve and capital regulations in the jurisdictions in which the captive reinsurers are based.  (*Id.* ¶¶ 64, 66; NYDFS Report 4-5).

In particular, the NYDFS found that many of these captive reinsurance transactions are or have been supported by parental guarantees, meaning the captive reinsurer's (and thus the primary insurer's) parent company is liable for any risk assumed by the captive reinsurer. (NYDFS Report 1).  And occasionally, under the looser regulatory requirements of the captive reinsurer's jurisdiction, the companies use these parental guarantees to either back a letter of

credit that is posted as collateral in order to obtain reserve credit for the reinsurance transaction, or use the parental guarantees *themselves* ("naked parental guarantees") to serve as collateral for the captive reinsurer's obligations.  (SAC ¶¶ 66-67; NYDFS Report 4).  In doing so, primary insurers obtain reserve credits — and thus are allowed to reduce the total amount of assets used to support their reserve liabilities — without completely transferring the risk associated with those policies, as the captive reinsurer's obligations are supported not by its *own* financial strength, but rather by that of the parent company.  (SAC ¶¶ 9-10, 68; NYDFS Report 1).  And before the NYDFS Report was released, little to no detail of these transactions — specifically, to what extent an insurer's reinsurance transactions were supported by parental guarantees — were revealed in life insurers' statutory annual statements (hence, the "shadow" in "shadow insurance").  (SAC ¶¶ 9, 90-96, 102; NYDFS Report 2-3).

The NYDFS report posits that the undisclosed parental guarantees at the heart of shadow insurance transactions could lead to negative consequences in the insurance industry. Significantly, the NYDFS found that none of the parent companies it had researched had amassed significant reserves or contingent liabilities to support the parental guarantees supplied as part of reinsurance transactions; in fact, most had amassed none at all.  (SAC ¶ 71; NYDFS Report 22).  Additionally, the factors that would lead to a captive reinsurer being unable to fulfill the claims it assumed, and thus a parent company having to fulfill its parental guarantees — such as changes in mortality rates or substantial decreases in asset returns — are those that would likely implicate the financial health of the parent company's entire insurance operation, meaning a parent company would likely already be subject to financial stress from its other risk exposures.  (SAC ¶ 73).  What is more, the general financial health (and creditworthiness) of a primary insurer is likely to be linked to that of its parent company, meaning that if a bank

declines to renew a parent company's letter of credit supporting a primary insurer's reserve

credit because of concerns about the parent company's financial strength, the primary insurer

may be unable to find other sources of funding for its reserves, leaving reserves depleted and

creating a risk that the primary insurer will be unable to pay claims.  (*Id.* ¶¶ 75-77).

The NYDFS also found that life insurers have used shadow insurance transactions to

manipulate their risk-based capital ratios — measures which, as noted above, are of critical

importance to brokers, agents, and informed consumers in assessing the financial strength of an

insurance company as part of life insurance purchase decisions.  (NYDFS Report 8-9; SAC

¶ 83).  Because a company's risk-based capital ratio is generally calculated by dividing an

insurer's total adjusted capital by the minimum capital an insurer is required to hold under a

formula determined by its regulator, an insurer can improve its risk-based capital ratio by simply

increasing its total adjusted capital — which, in turn, it can do by reducing its reserve liabilities.

(SAC ¶¶ 82, 84-85).  Because an insurer can reduce its reserve liabilities by obtaining reserve

credits through reinsurance — but, in the case of shadow insurance transactions, is allegedly not

actually reducing its risk — insurers use shadow insurance to make their risk-based capital ratios

appear higher than would be warranted by their actual financial strength.  (*Id.* ¶¶ 84-86).

**D. Plaintiffs' Claims Against AXA**

Plaintiffs Jonathan Ross and David Levin are New York residents who purchased AXA

life insurance policies in 2009 and 2013, respectively, and whose policies remain in effect.  (*Id.*

¶¶ 22-25).  Partially based on the NYDFS Report (according to Plaintiffs, AXA is the life insurer

named in "Case 4" in the Report (*id.* ¶ 4)), Plaintiffs allege that annual disclosures filed by AXA

as required by New York law were misleading because they failed to disclose details of the

shadow insurance transactions, thereby making AXA's financial health appear stronger than it

was.  (*Id.* ¶¶ 90-117, 122).  In its 2011 annual statement, for example, AXA reported $1.9 billion

in letters of credit securing the reinsurance obligations of its captive reinsurers; based on its

reinsurance transactions with captive reinsurer AXA Bermuda, AXA reported on that same

statement that it had obtained a reserve credit totaling close to $11 billion.  (*Id.* ¶¶ 93, 95).  That

reserve credit, however, was not obtained based on the financial strength of AXA Bermuda

alone, but rather through "undisclosed or inadequately disclosed guarantees and indemnifications

from an affiliate" — that is, parental guarantees.  (*Id.* ¶¶ 96-97).  Accordingly, "[b]ecause AXA

used [letters of credit] backed by undisclosed or inadequately disclosed parental guarantees to

lower its aggregate reserves for life [insurance] contracts, AXA's existing assets appeared to

provide policyholders with greater protection against loss than was actually the case."  (*Id.* ¶ 98).

Further, because AXA was able to reduce its aggregate reserves and increase its total adjusted

capital by virtue of these shadow insurance transactions, AXA's risk-based capital ratio — which

the NYDFS Report indicated had increased by 127% because of letters of credit backed by

"contractual parental guarantees" (NYDFS Report 11) — was "higher . . . than was warranted,"

again making AXA "appear more financially stable and well-capitalized."  (SAC ¶¶ 99-101).

Plaintiffs allege that AXA made similar representations on its annual statements for 2009, 2010,

and 2012, and "has not restated or corrected any of these figures" in its reports for all four years.

(*Id.* ¶¶ 102, 117; *see also id.* ¶¶ 103-16).

Notably, Plaintiffs do not allege in the Complaint that AXA's undisclosed or

inadequately disclosed shadow insurance transactions caused them financial harm by, for

example, increasing their premiums — an allegation that Plaintiffs had made in their first

amended complaint.  (*See* Am. Compl. (Docket No. 73) ¶¶ 87, 101).  Nor do Plaintiffs

specifically allege that they relied on, or were influenced by, AXA's representations in its annual

filings in deciding to purchase policies from AXA.  Instead, Plaintiffs allege that AXA's

representations regarding its financial health were those upon which rating agencies, brokers, and

consumers generally rely in either assessing the strength of the company or in making life

insurance purchasing decisions (SAC ¶¶ 121-27), and that "AXA's failure to disclose its shadow

insurance practices . . . meant that AXA could offer life insurance with fewer reserves and less

sound financial backing at a comparable price to other insurers that did not engage in such

practices."  (*Id.* ¶ 132; *see also id.* ¶¶ 37-39).  Ultimately, Plaintiffs allege, AXA's past failure to

disclose the parental guarantees "permitted AXA to place a product with undisclosed risks, and

one reflecting increased risk to the insurance system as a whole, onto the market" (*id.* ¶ 132),

meaning that "Plaintiffs and members of the Class have paid premiums for life insurance policies

that are less financially secure than AXA represented them to be."  (*Id.* ¶ 145).  Based on those

allegations, Plaintiffs bring suit pursuant to Section 4226 of New York's Insurance Law

("Section 4226"), which prohibits insurers from making any "misleading representation, or any

misrepresentation of the financial condition of any such insurer or of the legal reserve system

upon which it operates," and provides a cause of action to any person "aggrieved" by violations

of the statute.  N.Y. Ins. Law § 4226(a)(4), (d).  (SAC ¶¶ 141-46).

## PROCEDURAL HISTORY

This lawsuit was initially filed by Plaintiff Andrew Yale on April 23, 2014.  (Docket No.

2).  On June 16, 2014, AXA filed a motion to strike Plaintiff's class allegations pursuant to Rules

12(f), 23(c)(1)(A), and 23(d)(1)(D) of the Federal Rules of Civil Procedure and to dismiss the

Complaint pursuant to Rule 12(b)(1), arguing that class actions cannot be maintained under

Section 4226 and, in any event, cannot be brought on behalf of any out-of-state purchasers, thus

destroying diversity for the purposes of this Court's jurisdiction pursuant to the Class Action

Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A). (Docket Nos. 34-35). The Court denied

AXA's motion at an initial pretrial conference held on November 13, 2014. (*See* Docket Nos.

44, 55). Thereafter, counsel for Plaintiff obtained leave of Court to substitute Ross and Levin as

named Plaintiffs, and filed an amended complaint doing so on February 26, 2015. (Docket Nos.

69, 73). AXA moved for judgment on the pleadings on March 2, 2015, and — after the Court

granted Plaintiffs leave to amend to correct any deficiencies raised by AXA's motion and

Plaintiffs filed the Complaint — AXA filed the instant motion to dismiss on April 14, 2015.

(Docket Nos. 75, 80, 105). Additionally, Plaintiffs moved for class certification on April 1,

2015, a motion which became fully briefed on May 6, 2015. (Docket Nos. 87, 124).

## DISCUSSION

AXA moves to dismiss the Complaint and opposes Plaintiffs' motion for class

certification on multiple grounds, including lack of Article III standing. Because "[s]tanding is

the threshold question in every federal case, determining the power of the court to entertain the

suit," *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (internal quotation

marks omitted), the Court begins — and ultimately ends — there.

### A. Applicable Law

Article III of the United States Constitution restricts the "judicial Power" of the United

States to "Cases" and "Controversies." U.S. CONST. art. III, § 2. The Supreme Court has

interpreted this language to require that all suits filed in federal court be "cases and controversies

of the sort traditionally amenable to, and resolved by, the judicial process." *Steel Co. v. Citizens*

*for a Better Env't*, 523 U.S. 83, 102 (1998). Indeed, "no principle is more fundamental to the

judiciary's proper role in our system of government than the constitutional limitation of federal-

court jurisdiction to actual cases or controversies," *DaimlerChrysler Corp. v. Cuno*, 547 U.S.

10

332, 341 (2006) (internal quotation marks omitted), as the doctrine "serves to prevent the judicial process from being used to usurp the powers of the political branches," *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013).  And "[the] case-or-controversy requirement is satisfied *only* where a plaintiff has standing" to bring suit.  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008) (emphasis added).

The Supreme Court has, time and again, reaffirmed that the "irreducible constitutional minimum" of standing requires a plaintiff to establish three elements.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also DaimlerChrysler*, 547 U.S. at 342; *Allen v. Wright*, 468 U.S. 737, 751 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014).  Specifically, a plaintiff must show (1) an "injury in fact," (2) a sufficient "causal connection between the injury and the conduct complained of," and (3) a "likel[ihood]" that the injury "will be redressed by a favorable decision."  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan*, 504 U.S. at 560-61); *see Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013); *accord Baur v. Veneman*, 352 F.3d 625, 632 (2d Cir. 2003).  If a plaintiff fails to satisfy any of those elements, a federal court lacks subject-matter jurisdiction to hear the case and it must be dismissed.  *See Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC*, 433 F.3d 181, 198 (2d Cir. 2005).  Significantly, "[t]hat a suit may be a class action" — as this one is — "adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotation marks omitted); *see also, e.g.*, *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 159 (2d Cir. 2012) ("[T]o establish

Article III standing in a class action for every named defendant there must be at least one named plaintiff who can assert a claim directly against that defendant, and at that point standing is satisfied and only then will the inquiry shift to a class action analysis." (internal quotation marks omitted)).

The injury-in-fact requirement — which looms largest in this case — is meant to "ensure that the plaintiff has a personal stake in the outcome of the controversy." *Susan B. Anthony List*, 134 S. Ct. at 2341 (internal quotation marks omitted). An injury-in-fact is the "invasion of a legally protected interest which is . . . concrete and particularized" and "'actual or imminent, not conjectural or hypothetical.'" *Lujan*, 504 U.S. at 560 (internal quotation marks omitted and citations omitted). "'Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes.'" *Clapper*, 133 S. Ct. at 1147 (quoting *Lujan*, 504 U.S. at 564 n.2). Accordingly, an allegation of future injury is sufficient to establish standing only "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Susan B. Anthony List*, 134 S. Ct. at 2341 (quoting *Clapper*, 133 S. Ct. at 1147, 1150 n.5). Although Supreme Court precedent does not "uniformly require plaintiffs to demonstrate that it is literally certain that the harms they identify will come about" — hence, the "substantial risk" standard — no Article III standing exists if a plaintiff's theory of injury rests on an "attenuated chain of inferences necessary to find harm." *Clapper*, 133 S. Ct. at 1150 n. 5. Ultimately, the purpose of the imminence requirement is "to ensure that the court avoids deciding a purely hypothetical case in which the projected harm may ultimately fail to occur." *Baur*, 352 F.3d at 632.

## B. Analysis

Applying the foregoing standards, the Court is compelled to conclude that Plaintiffs lack standing to pursue their claims.  Plaintiffs' primary argument to the contrary is that they have been "individually deprived of their statutory right, conferred by New York law, to truthful financial reporting from a New York domiciled life insurer to whom they have paid premiums for life insurance" and that "[t]his deprivation is an injury-in-fact sufficient to confer Article III standing."  (Pls.' Mem. Law Opp'n Def.'s Mot. To Dismiss Second Am. Compl. (Docket No. 123) ("Pls.' MTD Mem.") 15).  In so arguing, Plaintiffs rely on Supreme Court precedent holding that "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute."  *Linda R.S. v. Richard D.*, 410 U.S. 614, 617 n.3 (1973); *see Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 42 (1976); *Warth v. Seldin*, 422 U.S. 490, 500 (1975); *accord Donoghue v. Bulldog Investors Gen. P'ship*, 696 F.3d 170, 175 (2d Cir. 2012).  Those holdings are premised on a theory that "Congress may, by legislation, expand standing to the full extent permitted by Art[icle] III, thus permitting litigation by one 'who otherwise would be barred by prudential standing rules,'" including those asserting generalized grievances or those asserting the legal interests of third parties rather than their own.  *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99-100 (1979) (quoting *Warth*, 422 U.S. at 501).  That is, although "the requirement of injury in fact is a hard floor of Article III jurisdiction that cannot be removed by statute," *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009), these cases hold that Congress may "create[] legal rights that *clarif*[y] the injury that would support standing," *Donoghue*, 696 F.3d at 180 (emphasis added).

The long-term soundness of the precedent upon which Plaintiffs rely is open to question, as the Supreme Court recently granted *certiorari* to consider "[w]hether Congress may confer

13

Article III standing upon a plaintiff who suffers no concrete harm, and who therefore could not otherwise invoke the jurisdiction of a federal court, by authorizing a private right of action based on a bare violation of a federal statute." *Robins v. Spokeo, Inc.*, No. 13-1339, 2014 WL 1802228 (U.S.), *cert. granted*, 135 S. Ct. 1892 (2015).  But regardless, Plaintiffs' reliance on the precedent suffers from a more fundamental problem:  It is far from clear that it applies where, as here, a cause of action arises under *state* rather than *federal* law.  As noted, the precedent is premised on the theory that "*Congress* may, by legislation, expand standing to the full extent permitted by Art[icle] III."  *Gladstone Realtors*, 441 U.S. at 99-100 (emphasis added).  And the Court is not aware of (and Plaintiffs do not cite) any authority suggesting that a *state* legislature can confer Article III standing upon a plaintiff who suffers no concrete harm merely by authorizing a private right of action based on a bare violation of a state statute.

> As one district court noted in addressing a similar argument:

> It is one thing when Congress enacts a statute, the violation of which constitutes "injury" in the Art. III sense.  Congress has, in that case, overridden the prudential limitations and provided an injury which confers standing.  It is quite another thing to suggest that the states have the same power to waive by statute the prudential, or more problematically, the constitutional limitations on standing in federal court and, by way of a state created right, confer injury in the Art. III sense where none would otherwise exist.

*Mangini v. R.J. Reynolds Tobacco Co.*, 793 F. Supp. 925, 929 (N.D. Cal. 1992).  This Court shares the *Mangini* Court's skepticism.  Among other things, the limitations on standing "serve[] vital interests going to the role of the Judiciary in our system of separated powers," *Hollingsworth*, 133 S. Ct. at 2667, and are "founded in concern about the proper — and properly limited — role of the courts in a democratic society," *Allen*, 468 U.S. at 750 (internal quotation marks omitted).  It follows that "[s]tates cannot alter that role simply by issuing to private parties who otherwise lack standing a ticket to the federal courthouse." *Hollingsworth*, 133 S. Ct. at 2667.  Thus, whether a state law authorizes standing, or whether a plaintiff has standing to bring

suit in state court more generally, is irrelevant to the Article III analysis.  *See, e.g.*, *Virgin Enterprises Ltd. v. Am. Longevity*, No. 99-CV-9854 (CSH), 2001 WL 34142402, at *3 (S.D.N.Y. Mar. 1, 2001); *Seibels Bruce Grp., Inc. v. R.J. Reynolds Tobacco Co.*, No. 99-CV-0593 (MHP), 1999 WL 760527, at *6 (N.D. Cal. Sept. 21, 1999).  In other words, "[s]tate courts may afford litigants standing to appear where federal courts would not, but the fact that a state court would permit a plaintiff to assert an action has no bearing on the plaintiff's standing under Article III." *LaPierre ex rel. Town of Yorktown v. DiBartolo*, No. 12-CV-1996 (ER), 2013 WL 656313, at *3 (S.D.N.Y. Feb. 21, 2013); *see also Henderson v. City of Meriden*, No. 11-CV-1174 (MPS), 2013 WL 2149706, at *6 n.6 (D. Conn. May 16, 2013) ("A state court ruling of the adequacy of legal interest is [not] binding here" (internal quotation marks omitted)).

Thus, it is insufficient for Plaintiffs to argue — as they do — that Section 4226 of New York Insurance Law, standing alone, confers upon them an "injury" sufficient to establish Article III standing.  Instead, Plaintiffs must establish that at least one of them has otherwise suffered an injury sufficient to entitle him to sue in federal court — namely, the "invasion of a legally protected interest which is . . . concrete and particularized" and "'actual or imminent, not conjectural or hypothetical.'"  *Lujan*, 504 U.S. at 560.  They have not done so.  They argue that AXA's conduct interfered with their "rights to full and accurate disclosure by insurers."  (Pls.' Mem. 20).  But, of course, to the extent that Plaintiffs had a "right" to full and accurate disclosure by AXA, it was created by state law, which — as discussed — cannot "confer injury in the Art. III sense where none would otherwise exist."  *Mangini*, 793 F. Supp. at 929; *see also Katz v. Pershing, LLC*, 672 F.3d 64, 78 (1st Cir. 2012) (noting that "an allegation that someone has failed to meet some legal requirement, without more, is insufficient to confer Article III standing").  Put differently, a person's abstract interest in accurate information from an entity —

without any actual or imminent injury arising from the entity's failure to disclose such information — does not constitute a "concrete and particularized" injury sufficient to confer a right to sue in federal court.  *See, e.g.*, *TeeVee Toons, Inc. v. Gerhard Schubert Gmb*, No. 00-CV-5189 (RCC), 2006 WL 2463537, at *4 (S.D.N.Y. Aug. 23, 2006) ("There is no allegation in the Complaint that [the plaintiff] directly relied on any misrepresentations by [the defendant] . . . thus it cannot be shown that [the plaintiff] has suffered a concrete and particularized injury in fact."); *see generally United States v. Richardson*, 418 U.S. 166, 177 (1974) (finding that while the "respondent has a genuine interest" in accurate information regarding the government's expenditures, he had not alleged that "he is in danger of suffering any particular concrete injury" because of a failure to obtain such information).

The other theories of injury presented in Plaintiffs' Complaint and memorandum of law are equally unavailing.  First, their Complaint alleges that they "have paid premiums for life insurance policies that are less financially secure than AXA represented them to be."  (SAC ¶ 145; *see also id.* ¶ 132 ("AXA's failure to disclose its shadow insurance practices (and, accordingly, its materially misleading representations of its financial condition and reserve system) meant that AXA could offer life insurance with fewer reserves and less sound financial backing at a comparable price to other insurers that did not engage in such practices.")).  Significantly, however, the Complaint does not allege that, as a result of having purchased or paid premiums for those life insurance policies, Plaintiffs themselves were injured, financially or otherwise.  Plaintiffs do not allege, for example, that they paid higher premiums as a result of AXA's misrepresentations (as they had in their first amended complaint).  *Accord Butler v. Obama*, 814 F. Supp. 2d 230, 239 (E.D.N.Y. 2011) ("[T]o the extent plaintiff is alleging a generalized injury of increased insurance premiums for the public as a whole, such an injury

cannot satisfy the particularized injury requirement mandated by Article III."); *see also In re UBS Erisa Litig.*, No. 08-CV-6696 (RJS), 2014 WL 4812387, at *6 (S.D.N.Y. Sept. 29, 2014) (dismissing the plaintiff's complaint for lack of standing because it contained "no allegations demonstrating Plaintiff's individual loss"), *aff'd sub nom.*, *Taveras v. UBS AG*, — F. App'x —, 2015 WL 1934576 (2d Cir. Apr. 30, 2015).[1]

In short, Plaintiffs received what they bargained for — life insurance — and do not allege, let alone plausibly allege, that they were financially harmed by virtue of their purchases. Plaintiffs' allegations are thus qualitatively different than those made by consumers who allege the purchase of a product that was, at the point of sale, reduced in value because of a corporation's misrepresentations — resulting in immediate, concrete, and particularized financial harm. *Cf., e.g.*, *Hughes v. Ester C Co.*, 930 F. Supp. 2d 439, 454 (E.D.N.Y. 2013) ("For each consumer who relies on the truth and accuracy of a label and is deceived by misrepresentations into making a purchase, the economic harm is the same: the consumer has purchased a product that he or she paid more for than he or she otherwise might have been willing to pay if the product had been labeled accurately. This economic harm [is] the loss of real dollars from a consumer's pocket."); *In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig.*, 701 F. Supp. 2d 356, 377-78 (E.D.N.Y. 2010) ("[C]ourts have long held that a plaintiff is injured, suffering an ascertainable loss, when he receives less than what he was promised . . . . Thus, plaintiffs' allegations that they were misled into purchasing a product that was less than what they bargained for are sufficient for Article III standing."); *cf. also Lipton v. Chattem, Inc.*,

---

[1]   Even if Plaintiffs had alleged in the Complaint that they paid higher premiums, that may not have been sufficient to constitute an injury-in-fact. *See Pittston Stevedoring Corp. v. Dellaventura*, 544 F.2d 35, 45 (2d Cir. 1976) (finding that the plaintiff had failed to establish standing by "submit[ing] nothing but conclusory assertions of adverse effect on future premiums"), *aff'd sub nom. Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249 (1977).

No. 11-CV-2952 (GSF), 2012 WL 1192083, at *3 (N.D. Ill. Apr. 10, 2012) (finding Article III standing where the plaintiff's "alleged injury is financial; she claims that she purchased a product worth less than what she paid for it, and also that she would not have purchased the product had she known it contained hexavalent chromium").[2]

Alternatively, Plaintiffs contend in their memorandum of law that they have been harmed because "New York's reserve and capital requirements are designed to prevent financial disasters

---

[2]     Even if Plaintiffs' general allegations regarding the effect of AXA's nondisclosures on the price of its products were somehow sufficient to establish an injury-in-fact as to either Plaintiff, they would lack Article III standing in any event.  This is because Plaintiffs at no point allege, plausibly or otherwise, that any financial harm they have individually suffered from AXA's pricing was fairly traceable to AXA's omissions or misrepresentations in its financial statements.  *See Ziemba v. Rell*, 409 F.3d 553, 554-55 (2d Cir. 2005) (noting that, in order to show a "'causal connection between the injury and the conduct complained of . . . the injury has to be fairly . . . traceable to the challenged action of the defendant'" (quoting *Lujan*, 504 U.S. at 560)).  Put another way, Plaintiffs nowhere allege that AXA's misrepresentations had a "determinative or coercive effect" on their purchasing decisions.  *Carver v. City of N.Y.*, 621 F.3d 221, 226 (2d Cir. 2010) (internal quotation marks omitted).

        That is, as Plaintiffs themselves admit (*see* Pls.' Mem. 30-35), they do not allege that their decision to purchase AXA insurance was specifically influenced by AXA's alleged misrepresentations regarding its shadow insurance transactions or that their life insurance purchasing decisions would have been different but for those alleged misrepresentations.  They do not assert, for example, that they specifically relied upon or even consulted AXA's annual statements before purchasing policies through AXA.  (Notably, despite their allegations regarding AXA's past misstatements, both Plaintiffs have remained policyholders with AXA. (SAC ¶¶ 23, 25).)  Accordingly, Plaintiffs fail to establish a causal connection between AXA's challenged conduct and any economic harm suffered by virtue of their purchasing decisions. *See, e.g.*, *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 984 (N.D. Cal. 2009) (dismissing one plaintiff's claims based on allegedly misleading advertising because its purchasing decision "was based on customer loyalty rather than the disputed advertising," and the plaintiff "fail[ed] to allege specifically that [it] heard, saw, relied upon, or otherwise [was] exposed to the allegedly misleading advertising"); *cf. Ester C Co.*, 930 F. Supp. 2d at 454 (holding that the plaintiffs had established the causation element of Article III standing because they adequately pleaded that their "economic injuries (here, the out-of-pocket cost of purchasing Ester-C as opposed to another brand) are fairly traceable to the alleged misrepresentations on Ester-C's packaging, as plaintiffs state that they would not have purchased Ester-C's products had they known the truth that the statements they relied on were false, misleading, deceptive, and unfair" (internal quotation marks omitted)).

in the future, and undermining those guarantees creates *increased risk* for the policyholders *now*." (Pls.' Mem. 20 (emphases added); *see id.* ("AXA's shadow insurance conduct jeopardizes the strength of the promises it has made *now* to pay claims far into the future.")). But absent any real or impending injury arising from AXA's practices and nondisclosures, Plaintiffs' conclusory allegations of current risk do not suffice to confer Article III standing. *See, e.g.*, *Katz*, 672 F.3d at 80 (rejecting the plaintiff's theory that she had been injured as a result of the defendant's failure to provide notice of a security breach because, "[c]ritically, the complaint does not contain an allegation that the plaintiff's nonpublic personal information has actually been accessed by any unauthorized user").

In the final analysis, because Plaintiffs do not allege that they would not have purchased policies from AXA but for its nondisclosures, or that they suffer any past or current financial harm by virtue of its misrepresentations, any risk of harm that they face is a risk of harm in the *future* — namely, the risk that AXA, by virtue of its shadow insurance transactions, will be unable to pay Plaintiffs' claims when they are eventually made. (*See, e.g.*, SAC ¶¶ 77-78). But to the extent Plaintiffs allege such a theory of injury, that possibility is far too hypothetical, speculative, and uncertain to constitute an "imminently threatened injury" worthy of federal judicial intervention. *Summers*, 555 U.S. at 492. In order for AXA's shadow insurance transactions — specifically, its failure to disclose parental guarantees in securing reserve credits for its reinsurance transactions — to cause AXA to become unable to pay Plaintiffs' claims when they are due, several intervening events (many entirely independent of the disputed transactions themselves or any alleged effects of the same) would have to occur. Most significantly, the captive reinsurer — which presumably is required by its own regulator to hold significant reserve capital, even if it was ultimately a parental guarantee and not that capital that supported AXA's

ability to obtain a reserve credit — would first have to default on its reinsurance obligations despite whatever surplus capital it holds.  Even then, AXA would have to draw down the letter of credit from the financial institution that provided it to the reinsurer; that financial institution, in turn, would have to call the parental guarantee issued in support of the letter of credit in the event that the captive reinsurer was unable to pay it back; the parent company would then have to be unable to meet its obligations under the guarantee; and finally, AXA would have to lack the capital — whether by virtue of reserve credits or otherwise, and despite the funds obtained from the letter of credit — to independently fulfill its obligations to policyholders.  Such a "highly attenuated chain of possibilities[] does not satisfy the requirement that threatened injury must be certainly impending."  *Clapper*, 133 S. Ct. at 1148; *see, e.g.*, *N.Y. Bankers Ass'n v. City of N.Y.*, No. 13-CV-7212 (KPF), 2014 WL 4435427, at *11 (S.D.N.Y. Sept. 9, 2014) (holding that, because six independent events would need to take place before the plaintiff would suffer any cognizable harm, the plaintiff's allegations "fail[ed] to make the leap from mere speculation to a credible threat") (internal quotation marks omitted)).

The Court's conclusion is consistent with the conclusion reached in *Taylor v. Bernanke*, No. 13-CV-1013 (ARR), 2013 WL 4811222, at *1-2, 7 (E.D.N.Y. Sept. 9, 2013), which involved a substantially similar theory of injury — that, by virtue of various governmental agencies' failure to implement certain provisions of the Dodd-Frank Act, the plaintiffs faced "increasing risk of loss of their bank deposits."  There, as here, the plaintiffs failed to allege that they had lost any funds (or even conceded that they had not).  *See id.* at *7.  In light of *Clapper*, the *Taylor* Court questioned whether the "risk of future economic harm of the type alleged" was "cognizable as injury."  *Id.*  Even assuming that it was, however, the Court concluded that "the risk alleged by plaintiffs is too speculative to confer standing," precisely because it rested on

three different events occurring in order for the banks to find themselves unable to cover the full extent of the plaintiffs' deposits. *Id.* Ultimately, the plaintiffs "fail[ed] to allege facts that would raise this chain of events above mere speculation to a 'credible threat.'" *Id.* (quoting *Baur*, 352 F.3d at 637); *see SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 526 (E.D.N.Y. 2013) ("[A] plaintiff has neither satisfied Article III standing, nor demonstrated that its claim is ripe, when an injury is contingent on a future event that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks omitted)), *aff'd*, 548 F. App'x 741 (2d Cir. 2014); *see also Lynch v. Malloy*, No. 13-CV-1646 (JAM), 2015 WL 3408795, at *5 (D. Conn. May 27, 2015) ("Plaintiffs allegedly fear prospective injury from the possibility that their alimony awards will be modified, but there is no indication, for any of the named plaintiffs, that an ex-spouse is even seeking such modification, let alone that it is 'certainly impending.'" (quoting *Clapper*, 133 S. Ct. at 1143)). The same is true here.

## CONCLUSION

For the reasons stated above, the Court concludes that Plaintiffs fail to demonstrate an injury sufficient to "satisfy the strictures of constitutional standing," *Cent. States*, 433 F.3d at 200, and that the Complaint must therefore be dismissed for lack of subject-matter jurisdiction. In light of that conclusion, the Court need not and will not address Defendants' other grounds for dismissal. *See, e.g.*, *McDermott v. New York Metro LLC*, 664 F. Supp. 2d 294, 297 (S.D.N.Y. 2009) ("The Court begins its analysis of defendants' motion with their standing argument, because if standing is lacking, then the court is without jurisdiction to consider other arguments for dismissal."); *see also Steel Co.*, 523 U.S. at 94 ("Without jurisdiction the court cannot proceed at all in any cause." (internal quotation marks omitted)). Further, Plaintiffs' motion for class certification must be and is denied as moot. *See Schroedel v. New York Univ. Med. Ctr.*,

885 F. Supp. 594, 600 (S.D.N.Y. 1995) (denying motion for class certification because the named plaintiff did not have Article III standing).[3]

The Court does not arrive at its conclusion lightly. The pervasiveness of shadow insurance in New York — and AXA's alleged failure to disclose details of those transactions — may well pose a threat to the stability and reliability of the state's insurance system, as NYDFS suggested. Nevertheless, the Court cannot address the legality or propriety of AXA's conduct without the constitutional authority to do so. The absence of "a substantial controversy . . . of sufficient immediacy and reality to justify judicial resolution," *Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union free Sch. Dist.*, 478 F.3d 494, 501 (2d Cir. 2007), does not, of course, mean that Plaintiffs — or life insurance policyholders more generally — are without recourse. To the contrary, one of the purposes of the injury-in-fact requirement is to ensure that generalized claims of this nature are "committed . . . ultimately to the political process." *Richardson*, 418 U.S. at 179. Notably, it appears that that process has at least partially served its purpose in this case: As Plaintiffs themselves concede, the NYDFS promulgated a new regulation after its investigation "explicitly requiring disclosure of additional information regarding shadow insurance transactions." (Pls.' Mem. 7-8). Ultimately, having failed to establish an injury-in-fact worthy of federal judicial intervention, it is those political channels (or, perhaps, state court) through (or in) which Plaintiffs must seek to resolve their grievances.

---

[3]    Some of the parties' submissions in connection with the motion for class certification were filed publicly in redacted form. (*See, e.g.*, Docket No. 94). In light of the fact that the Court did not need to consider those submissions, the right of public access does not call for disclosure and the redactions are hereby approved. *See, e.g.*, *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (noting that "the mere filing of a paper or document with the court is insufficient to render that paper a judicial document subject to the right of public access" and that "the item filed must be relevant to the performance of the judicial function and useful in the judicial process" (internal quotation marks omitted)).

The Clerk of Court is directed to terminate Docket Nos. 87 and 105 and to close the case.

SO ORDERED.

Date:   July 21, 2015
      New York, New York

                                         JESSE M. FURMAN
                                    United States District Judge